**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MICHAEL KIM, derivatively on behalf of POWER SOLUTIONS INTERNATIONAL, INC.,<br><br>Plaintiff,<br><br>v.<br><br>C. DINO XYKIS, XUN (KENNETH) LI, JIWEN ZHANG; FRANK P. SIMPKINS, HONG HE, COURTNEY C. SHEA, FUZHANG YU, ZUESEN YANG, AND ZHAO JIN,<br><br>Defendants,<br><br>and<br><br>POWER SOLUTIONS INTERNATIONAL, INC.,<br><br>Nominal Defendant | ) | Case No.: |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Michael Kim ("Plaintiff"), by and through the undersigned counsel, derivatively on behalf of Power Solutions International, Inc. ("Power Solutions" or the "Company"), submits this Verified Shareholder Derivative Complaint. Plaintiff's allegations are based upon personal knowledge, and upon information and belief developed from his counsel's investigation, which includes without limitation: a review of publicly-available filings made by Power Solutions with the United States Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits including the related securities class action complaint filed in *Dishion v. Power Solutions International, Inc., et al*, Case No. 1:26-cv-03149 (N.D. Ill.) (the "Securities Class Action"), and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Power Solutions against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law between May 8, 2025 and March 2, 2026, inclusive (the "Relevant Period") that have caused substantial harm to the Company.

2. Power Solutions designs, manufactures, and sells engines and power systems – primarily small engines used in either industrial equipment like forklifts, transportation vehicles, or in some cases, micro-power systems.

3. During the first half of fiscal 2025, as the Company's transportation end market declined, Power Solutions shifted its focus towards the rapidly growing data center market. The Company claimed that providing onsite power generation solutions amid the artificial intelligence driven data center expansion was a strong driving metric for strong present and future performance, including immediate financial benefits from what it described as a "high growth, higher-margin" business.

4. Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

5. On November 6, 2025, after the market closed, Power Solutions released its third

quarter 2025 financial results, revealing that "gross margin in the third quarter of 2025 was 23.9%, ***a decrease of 5.0%*** " year over year due in part to "***temporary inefficiencies related to our accelerated production ramp-up***"[1] for "key data center product lines." Further, the Company revealed that it "anticipates … sales growth of 45%" for full year 2025, which indicated a sharp deceleration as the Company had reported year-over-year growth of 74% in the second quarter and 62% in the third quarter 2025.

6. On this news, Power Solutions' stock price fell $15.55, or 19.14%, to close at $65.69 per share on November 7, 2025, on unusually heavy trading volume.

7. On March 2, 2026, after the market closed, Power Solutions issued a press release announcing fourth quarter and full year 2025 financial results, revealing that ***gross margin declined 8% year-over-year*** due to "***operating inefficiencies related to [the Company's] accelerated production ramp-up for data center product lines***." Further, the Company provided its outlook for 2026, including only "***moderate margin improvement*** from the products serving data center markets." The press release also revealed the Company was "executing specific actions to improve supply chain performance and manufacturing cost structures" but only now "***beginning*** to see measurable improvements, which [it] expect to build and support margin expansion ***over time.***"

8. Following these disclosures, Power Solutions stock price plummeted $24.84 or 28.97% to close at $60.91 on March 3, 2026, on unusually heavy trading volume.

9. As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

---

[1] Emphasis added unless otherwise noted.

10. As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered substantial harm and financial damage.

11. In light of the Individual Defendants' breaches of fiduciary duty, most of whom currently serve as directors of the Company, the Board's misconduct, and the substantial likelihood of liability in this derivative action as well as the potential liability of certain of the Individual Defendants in the Securities Class Action, a majority of the Board lacks the independence and disinterestedness needed to fairly and impartially consider a demand to initiate litigation on behalf of the Company against themselves. As further detailed herein, demand is, therefore, excused.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein arise under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R § 240.14a-9, promulgated thereunder. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the

defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

16. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17. ***Plaintiff*** is, and was at all relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the Corporation.

18. ***Nominal Defendant Power Solutions*** is incorporated under the laws of Delaware with its principal executive offices located in Wood Dale, Illinois. Power Solutions' common stock trades on the NASDAQ under the symbol "PSIX."

19. ***Defendant Dino Xykis*** ("Xykis") served as the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Xykis is named as a defendant in the Securities Class Action.

20. ***Defendant Xun Li*** ("Li") has served as the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Li is named as a defendant in the Securities Class Action.

21. ***Defendant Hong He*** ("He") has served as a director of the Company since

November 14, 2019. Defendant He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

22. ***Defendant Kui (Kevin) Jiang*** ("Jiang") served as a director of the Company from May 23, 2024 through his resignation, effective October 9, 2025. Defendant Jiang served as the Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.

23. ***Defendant Zhao Jin*** ("Jin") has served as a member of the Board since October 9, 2025. Defendant Jin is also a member of the Strategic Committee.

24. ***Defendant Courtney C. Shea*** ("Shea") has served as a member of the Board since July 24, 2025. Defendant Shea also served as a member of the Audit Committee and Compensation Committee.

25. ***Defendant Frank P. Simpkins*** ("Simpkins") has served as a director of the Company since July 13, 2017. Defendant Simpkins also serves as Chair of the Audit Committee and as a member of the Nominating Committee and Strategic Committee.

26. ***Defendant Xuesen Yang*** ("Yang") has served as a director of the Company since October 9, 2025. Defendant Yang also serves as a member of the Nominating and Governance Committee and the Compensation Committee.

27. ***Defendant Fuzhang Yu*** ("Yu") has served as a director of the Company since July 25, 2023. Defendant Yu also serves as a member of the Compensation Committee.

28. ***Defendant Jiwen Zhang*** ("J. Zhang") has served as a director and Chairman of the Board since March 29, 2023. Defendant J. Zhang also serves as Chair of the Strategic Committee and the Nominating and Governance Committee.

29. ***Defendant Gengsheng Zhang*** ("G. Zhang") served as a director of the Company

from September 16, 2022 through his resignation, effective October 9, 2025. Defendant G. Zhang served on the Nominating and Governance Committee and the Strategic Committee.

30. Defendants Xykis, Li, He, Jiang, Jin, Shea, Simpkins, Yang, Yu, J. Zhang, and G. Zhang are collectively referred to herein as the "Individual Defendants" and with Power Solutions, "Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

31. By reason of their positions as officers, directors, and/or fiduciaries of Power Solutions and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

32. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

34. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and

make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

35. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## CORPORATE GOVERNANCE

***Code of Business Conduct and Ethics Policy***

36. Power Solutions maintains a Code of Business Conduct and Ethics Policy (the "Code of Conduct") adopted "in effort to ensure that all of the Company's Board directors ("Directors"), officers and employees observe the highest standards of ethics in the conduct of the Company's business avoiding even the appearance of impropriety and conducting themselves with the highest regard and respect for others."

37. The Code of Conduct stated, under the heading "Individual and Management Responsibility," that:

> This Code applies to everyone working with and on behalf of the Company and its subsidiaries, including Directors, employees, temporary agencies, and any company or consultant engaged in providing services to the Company or its subsidiaries. We are each personally responsible for acting within the letter and spirit of the law and to uphold this Code. Supervisory personnel are responsible for ensuring that this Code is understood and enforced within their departments.
>
> The highest possible standards of ethical and business conduct are required of the Company's officers, employees, and Directors in the performance of their corporate responsibilities. It is the responsibility of every officer, employee and Director, and the policy of the Company to encourage its officers, employees, and Directors to ask questions, seek guidance and report in good faith.
>
> Violations of this Code, other Company policy or compliance program or applicable law, including failure to report potential violations by others, will be viewed as a severe disciplinary matter that may result in personnel action, including discharge from employment or removal from the Company's Board. This determination will be based upon the facts and circumstances of each particular situation. An employee accused of violating this Code will be given an opportunity to present his or her version of the events at issue prior to any determination of appropriate discipline.

38. Under the heading "Compliance with Laws, Rules, and Regulations," the Code of Conduct states, in relevant part, that all individuals subject to the Code of Conduct "must obey all federal, state, and local laws and regulations while conducting business on behalf of the Company."

39. Under the heading "Non-Retaliation," the Code of Conduct states:

> We will not tolerate retaliation against any employee who seeks to enforce his or her right to work in an environment free of unlawful discrimination or harassment, or who makes a good faith complaint or report of inappropriate or improper behavior to his or her manager, the Human Resources Department, Internal Audit or Legal Department or the Audit Committee. Retaliation includes taking or threatening to take adverse action against an employee: (i) because he or she made a good faith complaint or report about discrimination, sexual harassment, or a violation of this Code, other Company policy or compliance program: (ii) because he or she participated or assisted in an investigation of an alleged violation of this this Code, other Company policy or compliance program or otherwise sought to enforce his or her rights under any employment law or (iii) unless he or she agrees not to make a report about discrimination, sexual harassment, this Code, other Company policy or compliance program, or participate in an investigation of an alleged violation of this Code, other Company policy or compliance program or tell

the truth in such an investigation.

Regardless of how any known or possible concern or violation is reported, the Company prohibits retaliation against an employee who seeks help or reports questionable accounting, financial or auditing matters or possible violations of this Code, other Company policies or compliance programs or of applicable law and no employee will be subject to any form of reprisal for taking any such action based on such employee's reasonable belief or for participating in an investigation into any such matters. Additionally, there are several laws, known commonly as "whistleblower" statutes, which protect an employee from discharge or retaliation for disclosure to an employer or an appropriate governmental agency of, among other things, illegal, unethical, inappropriate, unsafe or hazardous situations.

40. Under the heading "Our Responsibilities," the Code of Conduct states:

Each of us at the Company is responsible for conducting ourselves in a manner that upholds the Company's standards and values. We are all accountable for our business conduct, must obey the laws which apply to our business, and must live up to the standards and values expressed in this Code. Your actions will be reviewed under this Code and applicable laws. If you do not act according to this Code and applicable laws, you may be subject to disciplinary action, including suspension, reduction in salary, demotion, or discharge. We at the Company cannot and will not compromise compliance with this Code or applicable laws to meet financial plans or maximize profits.

In addition to Company disciplinary actions, violations of many provisions of this Code are against the law and may subject a violator and/or the Company to severe penalties, fines and/or other consequences.

You have a responsibility to comply with the procedures set forth in the section of this Code titled "Individual and Management Responsibility" with respect to the prompt notification of the appropriate parties of any violations of this Code. As previously stated, you will not be subject to reprisals for reporting, in good faith, actions you feel violate this Code. We expect you to fully cooperate in any investigation of an alleged violation or other business conduct. Any waiver of this Code for officers or Directors may be made only by our Board and will be promptly disclosed as required by applicable law.

***Audit Committee Charter***

41. Power Solutions also maintains an Audit Committee Charter, which states, in relevant part:

The purpose of the Audit Committee (the "Committee") shall be to assist the Board of Directors (the "Board") of Power Solutions International, Inc. (the "Company") in

> overseeing (1) the integrity of the Company's financial statements and its accounting and financial reporting processes and financial statement audits; (2) the Company's compliance with legal and regulatory requirements; (3) the qualifications and independence of the registered public accounting firm that audits the Company's financial statements (the "Auditors"); (4) the performance of the Auditors and of the Company's Internal Audit Department (as defined below); (5) the Company's systems of disclosure controls and procedures; (6) the Company's internal accounting and financial reporting controls; and (7) the Company's compliance with ethical standards adopted by the Company. The Committee should encourage continuous improvement and should foster adherence to the Company's policies, procedures, and practices at all levels. The Committee's principal responsibility is one of oversight.

42. The Audit Committee Charter represents:

> **(f) Reports and Minutes.** The Committee shall report to the Board no less than quarterly, and in any event at each regularly scheduled Board meeting that follows a Committee meeting (other than a regularly scheduled Board meeting occurring in conjunction with such Committee meeting), with respect to (i) meetings of the Committee, (ii) such other matters as are relevant to the Committee's discharge of its responsibilities, and (iii) such recommendations as the Committee may deem appropriate. The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the performance and independence of the Auditors or the performance of the Internal Audit Department. The Committee shall maintain minutes and other records of meetings and activities of the Committee, as appropriate under Delaware law.

43. Under the heading "Responsibilities," the Audit Committee Charter states that "the primary recurring duties and responsibilities of the [Audit Committee] Charter" in carrying out the purposes of the Audit Committee include, in relevant part:

> **2. Establishment and Oversight of Internal Audit Department.**
>
> The Committee shall establish and oversee an internal audit function (the "Internal Audit Department"). Members of the Internal Audit Department shall include Company personnel and, at the Committee's discretion, outsourced personnel. The director of the Internal Audit Department shall be an executive of the Company no less senior than a vice president (the "Vice President, Internal Audit"). The Vice President, Internal Audit shall have full and free access to the Committee and the Committee shall have full and free access to the Vice President, Internal Audit. The Vice President, Internal Audit shall (a) report directly to the Committee, (b) communicate at least quarterly with the chief financial officer, chief executive officer and the Committee, and (c) attend all Committee meetings. At least annually, the Vice President, Internal Audit shall report the audit findings to the Committee, including which findings may

relate to the effectiveness and adequacy of the Company's internal controls, risk management and governance processes. The Vice President, Internal Audit shall also keep the Committee informed of emerging trends in relevant internal control issues and internal audit matters and provide the Committee with a report of outstanding audit issues and the current status of management's efforts to resolve and improve the control environment.

The Internal Audit Department shall keep a log tracking analysis, proposals and recommendations provided to other departments or management regarding internal controls and accounting and auditing procedures, including the time and place (if applicable) that such information was provided, and any deadlines related thereto.

The Committee shall periodically (i) review with the Company's management, as well as the Vice President, Internal Audit and other members of the Internal Audit Department, the plans, activities, staff, organizational structure, and effectiveness of the Internal Audit Department; and (ii) review findings and recommendations from completed internal audits.

**3. Internal Controls and Compliance Oversight.**

**(a) Review of Internal Controls and Accounting/Financial Resources.** The Committee shall review and discuss with the Auditors, financial and accounting personnel, and the Internal Audit. Department (i) the quality and depth of staffing in, and resources of, the Company's accounting, information services and financial departments, as needed, and (ii) the adequacy of the Company's 5 internal control over financial reporting and disclosure controls and procedures, including controls and security procedures with respect to the Company's information systems and the Company's process for assessing risk of fraudulent financial reporting and detecting major control weaknesses, and any related significant findings and recommendations of the Auditors and the Internal Audit Department (e.g., regarding deficiencies, significant deficiencies or material weaknesses), together with management's responses thereto, and the adequacy of disclosures about changes in internal control over financial reporting. The Committee shall also review with the Auditors, the Internal Audit Department and management the extent to which changes or improvements in financial or accounting practices have been implemented.

**(b) Management's Internal Controls Report.** The Committee shall review and discuss with the Auditors and management the report of management on the Company's internal control over financial reporting to be included when required in the Company's Annual Report on Form 10K prior to filing such Annual Report on Form 10-K with the SEC.

**(c) Submission of Complaints.** The Committee shall establish procedures for (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, (ii) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters, and (iii) the dissemination of

the procedures developed pursuant to clause (ii) above in a manner reasonably calculated to make them known to all Company employees. The Committee shall monitor and promote the Company's adherence to these procedures.

**(d) Financial Risk Exposure and General Compliance.** The Committee shall, on a quarterly basis, discuss and review with management the Company's major financial risk exposure and the steps management takes to implement plans to monitor and mitigate such risks, including risk assessment and management policies. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Company, any published reports that raise material issues regarding the Company's financial statements or accounting policies, tax matters, legal and regulatory compliance and correspondence between the Company and any regulatory or governmental authorities, and matters that could materially impact the Company's internal control over financial reporting, disclosure controls and procedures and financial reporting. The Committee shall, on an annual basis, review the Company's procedures for monitoring compliance with laws and regulations; as well as the Company's code of conduct and other policies relating to compliance with laws and regulations, throughout the Company.

* * *

**4. Financial Reporting.**

**(a) Financial Statement Review.** The Committee shall review and discuss with management and the Auditors the Company's annual audited and quarterly unaudited financial statements, including the Auditors' audit reports and the results of the Auditors' review of the quarterly financial statements (as applicable), as well as the related "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case prior to filing the financial statements with the SEC. The Committee shall recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K filed with the SEC. The Committee shall also confirm its authorization to file each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q containing the Company's financial statements.

**(b) Earnings Release Review.** Prior to their release, the Committee shall review all of the Company's earnings releases, paying particular attention to any pro forma or adjusted nonGAAP information included therein.

**(c) Disclosure Principles and Practices.** The Committee shall discuss with the Auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments. The Committee shall discuss with the Auditors and management the effect of regulatory and accounting initiatives, as well as any off-balance sheet structures, on the Company's financial statements.

**(d) Review of Certification Disclosures.** The Committee shall review and

discuss disclosures made to the Committee by the Company's chief executive officer and chief financial officer during the certification process for the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q about the effectiveness of the Company's disclosure controls and procedures, any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees having a significant role in the Company's internal control over financial reporting.

**(e) Audit Committee Report.** Based upon discussions with, and reliance upon, the Auditors and management, the Committee shall annually review and approve the report required by SEC rules to be included in the Company's annual proxy statement. In addition, the Committee will review any other audit committee-related disclosure in the Company's filings with the SEC or otherwise as required by applicable securities laws, rules and regulations or, if the Company's securities have become listed on a national securities exchange, by the rules of such exchange.

* * *

**6. Other.**

**(a) Committee Authority.** The Committee shall discharge its responsibilities, and shall assess the information provided to the Committee, in accordance with its business judgment. The Committee shall have the authority to (i) conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate and (ii) obtain advice and assistance from outside legal, accounting, or other advisers when necessary to perform its duties and responsibilities. In carrying out its duties and responsibilities, the Committee has the authority to seek any information it requires from employees, officers, and directors.

## SUBSTANTIVE ALLEGATIONS

44. Power Solutions designs, manufactures, and sells engines and power systems. The Company mainly sells small engines used in industrial equipment.

### ***Materially False and Misleading Statements During the Relevant Period***

45. The Relevant Period begins on May 8, 2025 when Power Solutions issued a press release (the "1Q25 Press Release") announcing the Company's first quarter 2025 financial results and highlighting its recent shift into the rapidly expanding data center market.

46. The 1Q25 Press Release touted the Company's sales growth as indicative of "the

growing demand for our solutions particularly in power systems, combined with company wide operational enhancements and a continued commitment to financial discipline." The 1Q25 Press Release also represented Power Solutions' strong margins as "***primarily due to improved mix***" of business and further stated that "***as part of our prioritization of the rapidly expanding data center sector, the Company is focused on improving and increasing our manufacturing capacity and capabilities to meet customers' evolving demand for our products.***"

47. Specifically, the 1Q25 Press Release stated, in relevant part:

> **<u>Financial Highlights</u>**
>
> | ($ in millions, except per share amounts) | Quarter Ended | | |
> |---|---|---|---|
> | | **March 31, 2025** | **March 31, 2024** | **Change** |
> | **Net sales** | $135.4 | $95.2 | 42% |
> | **Gross Profit** | $40.3 | $25.8 | 56% |
> | **Net Income** | $19.1 | $7.1 | 168% |
> | **Diluted Earnings per Share** | $0.83 | $0.31 | $0.52 |
>
> **<u>First Quarter 2025 Results</u>**
>
> PSI reported a strong profit for the three months ended March 31, 2025, with net income of $19.1 million and diluted earnings per share of $0.83, compared to net income of $7.1 million and diluted earnings per share of $0.31 for the first quarter of 2024.
>
> Dino Xykis, Chief Executive Officer, commented, "We are extremely pleased with our first quarter results, which represent the best first quarter performance in the Company's history. Achieving 42% year-over-year sales growth and a 168% increase in net income reflects the strength of our strategic focus and our team's relentless execution. This historic performance underscores ***the growing demand for our solutions particularly in power systems, combined with company wide operational enhancements and a continued commitment to financial discipline***.
>
> In addition, we are actively assessing the evolving tariff environment and are committed to proactively mitigating any associated risks through strategic sourcing, pricing actions, and supply chain agility. Our goal is to ensure continuity and competitiveness regardless of external headwinds."
>
> Sales for the first quarter of 2025 were $135.4 million, an increase of $40.2 million, or 42%, compared to the first quarter of 2024, primarily as a result of sales increases of $44.7 million and $0.8 million in the power systems and transportation end markets, respectively, offset by a decrease of $5.2 million

> within the industrial end market. ***This shift in markets reflects the conscious strategic prioritization toward higher growth markets such as data centers as well as oil and gas products. As part of our prioritization of the rapidly expanding data center sector, the Company is focused on improving and increasing our manufacturing capacity and capabilities to meet customers' evolving demand for our products.*** The lower industrial end market sales is primarily driven by reduced demand in the material handling market.
>
> Gross profit increased by $14.5 million, or 56%, during the first quarter of 2025 as compared to the same period in the prior year. ***Gross margin in the first quarter of 2025 was 29.7%, an increase of 2.7% compared to 27.0% in the same period last year, primarily due to improved mix,*** pricing actions, and lower warranty costs attributable to the Company's strategic sales shift away from some of our transportation customers. For the first quarter of 2025, warranty costs were $0.6 million, as compared to $1.5 million for the first quarter of 2024.

48. That same day, May 8, 2025, Power Solutions submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q with the SEC (the "1Q25 10-Q"), which was signed by Defendant Li and contained certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Xykis and Li, attesting to the accuracy of the statements contained therein.

49. The 1Q25 10-Q affirmed the previously reported financial results and further claimed the Company's "***growth in net revenue***" was "***driven by power systems markets, including data center***" sales, and was the result of the Company's "***prioritization toward higher growth, higher-margin markets***." The 1Q25 10-Q represented, among other things, that "***[p]ivoting the focus to these markets is driving current net sales growth and profitability.***"

50. Specifically, the 1Q25 10-Q stated, in relevant part:

> ***Recent Trends and Business Outlook***
>
> ***PSI's growth in net revenue for the three months in 2025 was driven by power systems markets, including data center*** and oil and gas products, partially offset by lower sales from more mature, lower-margin markets such as industrial. This shift in markets reflects the Company's conscious

> ***strategic prioritization toward higher growth, higher-margin markets*** with less emphasis on more mature markets.
>
> The Company is focused on leading the business through a growth phase with a stronger balance sheet while strategically prioritizing products that demonstrate strong demand and ***higher gross margins.*** Consistent with those goals, the Company is actively pursuing several initiatives to enhance and expand manufacturing capacity to meet the increasing demand from data center markets. ***Pivoting the focus to these markets is driving current net sales growth and profitability.*** Through expanded capacity and strategic partnerships, management expects this positive trend to continue.
>
> * * *
>
> ***Net Sales***
>
> Net sales increased $40.2 million, or 42%, during the three months ended March 31, 2025 compared to the three months ended March 31, 2024, as a result of sales increases of $44.7 million and $0.8 million in the power systems and transportation end markets, respectively, partly offset by a decrease of $5.2 million in the industrial end market. ***Higher power systems end market sales were primarily due to increased demand for*** products across various applications, with ***the largest increases attributable to products*** used within the packaging market such as enclosures ***serving the fast-growing data center market,*** and oil and gas products. ***The Company is strategically prioritizing the rapidly expanding data center sector, improving and increasing our manufacturing capacity and capabilities to meet our customers' evolving demands for our products.*** The lower industrial end market sales is primarily driven by reduced demand in the material handling market. The Company is actively pursuing new industrial customers for sales growth.

51. The statements referenced in ¶¶45-50 were materially false and/or misleading, and failed to disclose material adverse facts about Power Solutions' business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, the Individual Defendants'

positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

52. On June 13, 2025, Power Solutions filed its 2025 Proxy Statement on Schedule 14A with the SEC (the "2025 Proxy Statement") in connection with the Company's July 24, 2025 Annual Meeting of Stockholders. Through the 2025 Proxy Statement, Individual Defendants J. Zhang, Jiang, Simpkins, He, G. Zhang, and Yu solicited shareholder approval for, *inter alia*, (1) the re-election/election of Defendants J. Zhang, Jiang, Simpkins, Shea, He, G. Zhang, and Yu to the Board and (2) approval, in a non-binding advisory vote, of the compensation of the Company's named executive officers.

53. In soliciting stockholders' votes, the 2025 Proxy Statement represented that the Company's "business, property and affairs are managed under the direction of the Board" and that the Board was "kept informed of [Power Solutions'] business" through its interactions with management and review of information provided to directors.

54. The 2025 Proxy Statement described the Board's risk-oversight responsibilities and represented that Power Solutions maintained governance structures designed to oversee significant business risks. It further emphasized the Company's Code of Conduct and the Board's and committees' roles in overseeing risk management, compliance, internal controls, and disclosure-related matters.

55. Regarding the Board's role in risk oversight, the 2025 Proxy Statement stated:

> **Role of the Board in Risk Oversight**
>
> The Board and its committees have an advisory role in risk oversight for the Company. Company management maintains primary responsibility for the risk management of the Company, however, the Audit Committee and the Board review a risk assessment of the Company on a regular basis. While it is not possible to identify and mitigate all potential risks, the Board relies on the representations of management and the external audit of the financial statements to provide comfort

on the Company's ability to manage its risks. Management's discussion of current risk factors is set forth in the Company's Annual Report.

56. With respect to the Audit Committee, the 2025 Proxy Statement stated that the responsibilities of the Audit Committee include:

- reviewing and discussing with management and the independent registered public accounting firm the annual audited and quarterly unaudited financial statements;
- discussing analyses prepared by management or the independent registered public accounting firm concerning significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements;
- annually reviewing and approving the Audit Committee report required by SEC rules to be included in the Company's annual proxy statement;
- discussing and reviewing with management, on a quarterly basis, major financial risk exposure and risk management policies;

* * *

- establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters;
- establishing procedures for hiring employees and former employees of the independent registered public accounting firm;
- establishing and overseeing the internal audit function;
- reviewing earnings releases;
- conducting an evaluation of the committee's performance and reporting its results to the Board;

- reviewing and discussing disclosures made by the Company's CEO and CFO during the certification process for the Company's annual reports and quarterly reports regarding the effectiveness of disclosure controls and procedures and significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting; and

- reviewing and discussing with management the Company's compliance with financial covenants in its credit facility, as well as any material debt instruments issued by any of the Company's subsidiaries.

57. The 2025 Proxy Statement emphasized that Defendants Simpkins and He were qualified to perform these responsibilities of the Audit Committee as "audit committee financial expert[s]" under the applicable SEC rules.

58. In addition to the Audit Committee's financial disclosure oversight responsibilities, the 2025 Proxy Statement described the responsibilities of the Board's Strategic Committee, comprised of Defendants J. Zhang (as Chair), Simpkins, and G. Zhang. The Strategic Committee was responsible for "developing and recommending strategic plans and initiatives," overseeing the Company's strategic objectives, "monitoring progress toward strategic goals," and overseeing management's identification and mitigation of risks to the Company's strategic objectives.

59. The 2025 Proxy Statement was false and misleading because it failed to disclose that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business,

operations, and prospects were materially misleading and/or lacked a reasonable basis.

60. Further, the 2025 Proxy Statement was materially false and misleading because it failed to notify shareholders that Power Solutions' purported risk-oversight mechanisms had failed to adequately identify, escalate, monitor, or address material operational and financial risks.

61. These false and misleading elements of the 2025 Proxy Statement were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors. Based upon the materially false and misleading 2025 Proxy Statement, Defendants J. Zhang, Jiang, Simpkins, Shea, He, G. Zhang, and Yu were elected/re-elected to the Board on July 24, 2025.

62. Notably, on July 23, 2025, one day before the 2025 Annual Meeting at which Defendants J. Zhang, Jiang, Simpkins, Shea, He, G. Zhang, and Yu were elected to the Board, Kenneth W. Landini ("Landini") resigned from the Board and the Audit Committee. In his resignation letter dated that day, Landini stated that he was not nominated for re-election because of his "insistent on complying with the Board's fiduciary duties, including that of loyalty, by notifying the board in writing of its obligations to…protect [Power Solutions'] supply chain by overseeing management's assessment of risk."

63. Power Solutions subsequently disclosed that the Board disagreed with Landini's allegations. However, Power Solutions did not publicly disclose Landini's resignation letter until five days after the 2025 Annual meeting at which stockholders voted on the election of Company directors.

64. On August 7, 2025, Power Solutions issued a press release announcing second quarter 2025 financial results (the "2Q25 Press Release"). The 2Q25 Press Release touted the Company's financial results as well as the pivot into the data center market, including its sales

growth, as indicative of "***strong demand for our power systems solutions***" and "***our deliberate strategic focus on higher-growth sectors such as data centers.***" The Company further provided assurances that it was "***prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand***." Finally, the 2Q25 Press Release attributed the decline of gross margins during the quarter merely to sales in "comparatively lower-margin products and ***temporary*** inefficiencies related to our accelerated production ramp-up."

65. Specifically, the 2Q25 Press Release stated, in relevant part:

**Financial Highlights**

| ($ in millions, except per share amounts) | Quarter Ended | | |
|---|---|---|---|
| | June 30, 2025 | June 30, 2024 | Change |
| **Net Sales** | $191.9 | $110.6 | 74% |
| **Gross Profit** | $54.1 | $35.2 | 54% |
| **Net Income** | $51.2 | $21.5 | 138% |
| **Diluted Earnings per Share** | $2.22 | $0.94 | $1.28 |

**Second Quarter 2025 Results**

PSI reported record sales and profit for the three months ended June 30, 2025, with sales of $191.9 million, net income of $51.2 million and diluted earnings per share of $2.22, compared to sales of $110.6 million, net income of $21.5 million and diluted earnings per share of $0.94 for the second quarter of 2024. Second quarter 2025 adjusted net income was $51.8 million, compared to adjusted net income of
$16.6 million for the second quarter of 2024, an increase of 213%.

Dino Xykis, Chief Executive Officer, commented, "We are very pleased with our second quarter results, which marks the strongest sales and profit performance in our Company's history. ***Achieving 74% year-over-year sales growth and 138% increase in net income reflects strong demand for our power systems solutions,*** the disciplined execution of our strategy, the commitment and dedication of our employees, and favorable tax benefits.

* * *

Sales for the second quarter of 2025 were $191.9 million, an increase of $81.3 million, or 74%, compared to the second quarter of 2024, ***primarily as a result of***

> ***a sales increase of $83.8 million in the power systems end market***, offset by a decrease of $1.6 million and $0.9 million within the industrial and transportation end markets, respectively. ***This shift in market mix reflects our deliberate strategic focus on higher-growth sectors such as data centers*** and oil and gas. In particular, we are ***prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand***. The decline in industrial sales is largely attributable to softer demand in the material handling market.
>
> Gross profit increased by $18.9 million, or 54%, during the second quarter of 2025 as compared to the same period in the prior year. Gross margin in the second quarter of 2025 was 28.2%, a decrease of 3.6% compared to 31.8% in the same period last year. ***Gross margin was impacted due to strong sales growth in comparatively lower-margin products and temporary inefficiencies related to our accelerated production ramp-up***.

66. On August 8, 2025, Power Solutions filed its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC (the "2Q25 10-Q"), which was signed by Defendant Li and contained SOX certifications signed by Defendants Xykis and Li, attesting to the accuracy of the statements contained therein. The 2Q25 10-Q affirmed the previously reported financial results. Further, the 2Q25 10-Q claimed the Company's "growth in net revenue for the six months in 2025 was driven by power systems markets, including data center" sales as the result of the Company's "strategic prioritization toward higher growth, higher-margin markets." The 2Q25 10-Q further reported that the Company is "***[p]ivoting the focus to these markets is driving current net sales growth and profitability.***" Finally, the 2Q25 10-Q attributed the decline of gross margins merely to sales in "comparatively lower-margin products and ***temporary*** inefficiencies related to our accelerated production ramp-up."

67. Specifically, the 2Q25 10-Q stated, in relevant part:

> **Recent Trends and Business Outlook**
>
> PSI's growth in ***net revenue for the six months in 2025 was driven by power systems markets, including data center*** and oil and gas products, partially offset by lower sales from more mature, lower-margin markets

such as industrial. This shift in markets reflects the Company's conscious ***strategic prioritization toward higher growth, higher-margin markets*** with less emphasis on more mature markets.

***The Company is focused on leading the business through a growth phase with a stronger balance sheet while strategically prioritizing products that demonstrate strong demand and higher gross margins. Consistent with those goals, the Company is actively pursuing several initiatives to enhance and expand manufacturing capacity to meet the increasing demand from data center markets. Pivoting the focus to these markets is driving current net sales growth and profitability. Through expanded capacity and strategic partnerships, management expects this positive trend to continue.***

* * *

*Net Sales*

***Net sales increased $81.3 million, or 74%,*** during the three months ended June 30, 2025, compared to the three months ended June 30, 2024, ***as a result of higher sales of $83.8 million in the power systems end market,*** partially offset by a decrease of $1.6 million and $0.9 million within the industrial and transportation end markets, respectively. ***This shift in market mix reflects our deliberate strategic focus on higher-growth sectors such as data centers*** and oil and gas. ***In particular, we are prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand***. The decline in industrial sales is largely attributable to softer demand in the material handling market.

Net sales increased $121.5 million, or 59%, during the six months ended June 30, 2025, compared to the six months ended June 30, 2024, as a result of higher sales of $128.6 million in the power systems end market, partially offset by a decrease of $6.9 million and $0.2 million within the industrial and transportation end markets, respectively***. This shift in market mix reflects our deliberate strategic focus on higher-growth sectors such as data centers and oil and gas.*** In particular, we are prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand. The decline in industrial sales is largely attributable to softer demand in the material handling market.

***Gross Profit***

Gross profit increased during the three months ended June 30, 2025 by $18.9 million, or 54%, compared to the three months ended June 30, 2024. Gross margin was 28.2% and 31.8% during the three months ended June

> 30, 2025 and 2024, respectively. ***The decrease in gross margin is primarily due to strong sales growth in comparatively lower-margin products and temporary inefficiencies related to our accelerated production ramp-up.***
>
> Gross profit increased during the six months ended June 30, 2025 by $33.4 million, or 55%, compared to the six months ended June 30, 2024. Gross margin was 28.8% and 29.6% during the six months ended June 30, 2025 and 2024, respectively. ***The decrease in gross margin is primarily due to strong sales growth in comparatively*** *lower-margin products and temporary inefficiencies related to our accelerated* production ramp-up.

68. On September 5, 2025, Power Solutions released an investor update presentation (the "Presentation") that touted the Company's investment highlights, including significant purported "margin expansion opportunities" such as the "increase mix of Power Systems business, which offers superior margins," and the Company's "ability to leverage existing infrastructure … to drive future growth." The Presentation also reiterated that any decline in gross margins was due merely to "sales growth in comparatively lower margin products and temporary inefficiencies related to our accelerated production ramp-up."

69. Specifically, the Presentation stated, in relevant part:




70. The statements identified or referenced in ¶¶64-69 were materially false and/or misleading, and failed to disclose material adverse facts about Power Solutions' business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***The Truth Begins to Emerge as the False and Misleading Statements Continue***

71. On November 6, 2025, after the market closed, the truth began to emerge when Power Solutions released a press release announcing its third quarter 2025 financial results (the "3Q25 Press Release"). The 3Q25 Press Release revealed that "gross margin in the third quarter

of 2025 was 23.9%, ***a decrease of 5.0%***" year over year due to "***temporary inefficiencies related to our accelerated production ramp-up***" for "key data center product lines." Further, the Company revealed it "anticipates … ***sales growth of 45%*** for 2025 compared to 2024" despite seeing sales growth of 62% in the third quarter and 74% in the second quarter.

72. Specifically, the 3Q25 Press Release stated, in relevant part:

> **Financial Highlights**
>
> | ($ in millions, except per share amounts) | Quarter Ended | | |
> |---|---|---|---|
> | | **September 30, 2025** | **September 30, 2024** | **Change** |
> | **Net Sales** | $203.8 | $125.8 | 62% |
> | **Gross Profit** | $48.7 | $36.4 | 34% |
> | **Net Income** | $27.6 | $17.3 | 59% |
> | **Diluted Earnings per Share** | $1.20 | $0.75 | $0.45 |
>
> **Third Quarter 2025 Results**
>
> PSI reported record net sales of $203.8 million and net income of $27.6 million, or $1.20 per diluted share, for the three months ended September 30, 2025. This compares to net sales of $125.8 million and net income of $17.3 million, or $0.75 per diluted share, for the same period in 2024, representing increases of 62% in net sales and 59% in net income.
>
> Dino Xykis, Chief Executive Officer, said, "We achieved the highest sales in our company's history this quarter, delivering strong financial performance with sales increasing 62% and net income rising 59%. These results underscore the robust demand for our power systems solutions, particularly within the data center market. During the quarter, we expanded our manufacturing capacity and increased production across key data center product lines. We are continuing to ramp up production to ensure on-time delivery while implementing targeted operational improvements to enhance efficiency, execution and future growth going forward."
>
> Sales for the third quarter of 2025 were $203.8 million, an increase of $78.0 million, or 62%, compared to the third quarter of 2024, primarily as a result of a sales increase of $85.3 million in the power systems end market, offset by a decrease of $4.7 million and $2.6 million within the industrial and transportation end markets, respectively. This shift in market mix reflects our deliberate strategic focus on higher-growth sectors such as data centers and oil and gas. In particular, we are prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand. The decline in industrial sales is largely attributable to softer demand in the materials handling market.

> Gross profit increased by $12.3 million, or 34%, during the third quarter of 2025 as compared to the same period in the prior year. ***Gross margin in the third quarter of 2025 was 23.9%, a decrease of 5.0% compared to 28.9% in the same period last year. Gross margin was impacted due to*** strong sales growth in comparatively lower-margin products and ***temporary inefficiencies related to our accelerated production ramp-up.***
>
> * * *
>
> **<u>Outlook for 2025</u>**
>
> ***The Company anticipates strong sales growth of 45% for 2025 compared to 2024,*** driven by expected growth in the power systems end market including products supporting data centers, while sales in the industrial and transportation end markets are projected to remain flat.

73. On November 6, 2025, Power Solutions filed its quarterly report for the period ended September 30, 2025 on a Form 10-Q filed with the SEC (the "3Q25 10-Q"), which was signed by Defendant Li and contained SOX certifications signed by Defendants Xykis and Li, attesting to the accuracy of the statements contained therein. The 3Q25 10-Q affirmed the previously reported financial results as well as the Company's results of operations. The 3Q25 10-Q represented that the Company's "***growth in net revenue***" was "***driven by power systems markets, including data center***" sales as part of the Company's ***"strategic prioritization toward higher growth, higher-margin markets.***" Further, the 3Q25 10-Q continued to claim that "***[p]ivoting the focus to these markets is driving current net sales growth and profitability.***"

74. Specifically, the 3Q25 10-Q stated, in relevant part:

> **Recent Trends and Business Outlook**
>
> ***PSI's growth in net revenue for the nine months in 2025 was driven by power systems markets, including data center*** and oil and gas products, partially offset by lower sales from more mature, lower-margin markets such as industrial. This shift in markets ***reflects the Company's conscious strategic prioritization toward higher growth, higher-margin markets*** with less emphasis on more mature markets.
>
> ***The Company is focused on leading the business through a growth phase***

> ***with a stronger balance sheet while strategically prioritizing products that demonstrate strong demand and higher gross margins.*** Consistent with those goals, the Company is actively pursuing several initiatives to enhance and expand manufacturing capacity to meet the increasing demand from data center markets. ***Pivoting the focus to these markets is driving current net sales growth and profitability.*** Through expanded capacity and strategic partnerships, management expects this positive trend to continue.

75. On this news, Power Solutions' stock price fell $15.55, or 19.14%, to close at $65.69 per share on November 7, 2025, on unusually heavy trading volume.

76. The statements identified or referenced in ¶¶73-74 were materially false and/or misleading and failed to disclose material adverse facts about Power Solutions' business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

***<u>The Truth is Fully Revealed</u>***

77. On March 2, 2026, after the market closed, Power Solutions issued a press release announcing fourth quarter and full year 2025 financial results (the "4Q25 Press Release"), revealing that ***gross margin declined 8% year-over-year*** due to "operating inefficiencies related to [the Company's] accelerated production ramp-up for data center product lines." Further, the Company provided its outlook for 2026, including only "***moderate*** margin improvement from the products serving data center markets." The 4Q25 Press Release revealed that Power Solutions was "executing specific actions to improve supply chain performance and

manufacturing cost structures" but only now "***beginning*** to see measurable improvements, which [it] expect to build and support margin expansion ***over time.***"

78. Specifically, the 4Q25 Press Release stated, in relevant part:

**Financial Highlights**

| ($ in millions, except per share amounts) | Quarter Ended | | |
|---|---|---|---|
| | **December 31, 2025** | **December 31, 2024** | **Change** |
| **Net sales** | $191.2 | $144.3 | 33% |
| **Gross profit** | $41.8 | $43.2 | (3)% |
| **Income before income taxes** | $22.7 | $22.8 | (1)% |
| **Net income** | $16.1 | $23.3 | (31)% |
| **Diluted earnings per share** | $0.70 | $1.01 | $(0.31) |

| ($ in millions, except per share amounts) | Year Ended | | |
|---|---|---|---|
| | **December 31, 2025** | **December 31, 2024** | **Change** |
| **Net sales** | $722.4 | $476.0 | 52% |
| **Gross profit** | $184.9 | $140.5 | 32% |
| **Income before income taxes** | $103.4 | $70.2 | 47% |
| **Net income** | $114.0 | $69.3 | 65% |
| **Diluted earnings per share** | $4.94 | $3.01 | $1.93 |

**Fourth Quarter 2025 Results**

PSI reported net sales of $191.2 million and net income of $16.1 million, or $0.70 per diluted share, for the three months ended December 31, 2025. This compares to net sales of $144.3 million and net income of $23.3 million, or $1.01 per diluted share, for the same period in 2024, representing an increase of 33% in net sales and a decrease of 31% in net income.

Dino Xykis, Chief Executive Officer, said, "In 2025, the Company delivered record sales and profitability, with annual sales increasing 52% and annual net income rising 65%. This performance reflects continued demand for our power systems solutions, including demand within the data center market. During the quarter, operating efficiency was impacted by the ramp up of new manufacturing capacity and increased volumes across certain product lines. Management has identified the key drivers and is executing specific actions to improve supply chain performance and manufacturing cost structures. We are beginning to see measurable improvements, which we expect to build and support margin expansion over time.

We recently completed the acquisition of MTL Manufacturing & Equipment, Inc. ("MTL"), a company that specializes in the welding and fabrication of steel components. This acquisition is expected to enhance PSI's competitive position in the data center market through vertical integration of MTL's specialized manufacturing capabilities. The integration is designed to provide improved supply chain control, reduced

> lead times, and access to MTL's established UL Solutions certifications."
>
> Sales for the fourth quarter of 2025 were $191.2 million, an increase of $46.9 million, or 33%, compared to the fourth quarter of 2024, primarily as a result of sales increases of $46.8 million and $3.0 million in the power systems and industrial end markets, respectively, partly offset by decreases of $2.9 million in the transportation end market. This shift in market mix reflects our deliberate strategic focus on higher-growth sectors such as data centers and oil and gas. In particular, we are prioritizing the rapidly expanding data center sector by enhancing our manufacturing capacity and capabilities to meet evolving customer demand.
>
> Gross profit decreased by $1.4 million, or 3%, during the fourth quarter of 2025 as compared to the same period in the prior year. Gross margin in the fourth quarter of 2025 was 21.9%, a decrease of 8.0% compared to 29.9% in the same period last year. Gross margin was impacted by operating inefficiencies related to our accelerated production ramp-up for data center product lines.

79. On this news, Power Solutions stock fell $24.84 or 28.97% to close at $60.91 on March 3, 2026, on unusually heavy trading volume.

**<u>THE INDIVIDUAL DEFENDANTS SOLD COMPANY STOCK AT ARTIFICALLY INFLATED PRICES</u>**

80. During the Relevant Period, Power Solution's stock price was artificially inflated as a result of the false and misleading statements the Individual Defendants caused Power Solutions to make. Defendants Xykis, Li, Simpkins, and He (the "Insider Selling Defendants"), while in possession of material, nonpublic information, capitalized on the artificially inflated stock price by selling their shares of Power Solutions common stock. These insider sales demonstrate the Insider Selling Defendants' motive in facilitating and participating in the wrongdoing.

81. During the Relevant Period, while the Company's stock price was artificially inflated, Defendant Xykis sold 33,859 shares of Power Solutions common stock, receiving gross proceeds of approximately $3.2 million.

82. During the Relevant Period, while the Company's stock price was artificially

inflated, Defendant Li sold 8,000 shares of Power Solutions common stock, receiving gross proceeds of approximately $738,892.

83. During the Relevant Period, while the Company's stock price was artificially inflated, Defendant Simpkins sold 15,000 shares of Power Solutions common stock, receiving gross proceeds of $1.39 million.

84. During the Relevant Period, while the Company's stock was artificially inflated, Defendant He sold 10,000 shares of Power Solutions common stock, receiving gross proceeds of approximately $915,840.00.

85. As a result of the false and misleading statements and the failures to disclose, the Insider Selling Defendants sold stock at prices not reflective of the Company's value, which the Insider Selling Defendants knew at the time at which they made those sales.

## DAMAGES TO POWER SOLUTIONS

86. As a direct and proximate result of the Individual Defendants' misconduct, Power Solutions has expended and will continue to expend significant sums of money.

87. Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

88. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defendant any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

89. Such expenditures also include the lucrative and compensation paid to each of the Individual Defendants in their respective roles as officers and/or directors of the Company despite failing to carry out the duties owed the Company by virtue of the Individual Defendants' holding

such positions.

90. As a direct and proximate results of the Individual Defendants' misconduct, Power Solutions has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91. Plaintiff brings this action derivatively in the right and for the benefit of Power Solutions to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

92. Power Solutions is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it otherwise would not have.

93. Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

94. Plaintiff owns shares of Power Solutions and has been a continuous holder of the Company's shares at all relevant times.

95. A pre-suit demand on the Board is futile and, therefore, excused. At the time this suit was filed, the Board consisted of the following seven individuals: Defendants J. Zhang; Yang; Simpkins; Shea; He; Jin; and Yu (the "Director Defendants"). Plaintiff is required to show that at least four of the Director Defendants cannot exercise independent, objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent or disinterested decision to institute and vigorously prosecute this action, including because they face a substantial

likelihood of liability. As such, demand on the Board is unnecessary because such a demand would be a futile act.

96. Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

97. The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal these wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

98. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

99. According to the 2026 Proxy Statement filed with the SEC on Schedule 14A on June 6, 2026 (the "2026 Proxy Statement"), Power Solutions is a "controlled company" under the Nasdaq Marketplace Rules. This designation is a result of Weichai America Corp., a wholly owned subsidiary of Weichai Power Co, Ltd. (collectively, "Weichai") having direct ownership of

approximately 46% of the Company's outstanding stock and holding more than 50% of the voting power for the election of Power Solutions' directors through contractual agreements, pursuant to which Weichai may designate representatives to Power Solutions' Board.

100. Demand is futile as to Defendants J. Zhang, Jin, Yang, and Yu because each of them serve on the Board as Weichai designees and maintain substantial, ongoing professional and financial ties to Weichai or its affiliates, including current senior executive and employment positions within the Weichai organization. According to the 2026 Porxy Statement, Power Solutions itself has determined that each of these four directors is not independent under Nasdaq's listing standards. As a result of these Defendants' relationships and continuing professional and financial dependence on Weichai, and Weichai's control of their positions as directors of Power Solutions, Defendants J. Zhang, Jin, Yang, and Yu could not impartially consider whether the Company should pursue claims against the Individual Defendants, including themselves, for the misconduct, as that would expose them to substantial liability and threaten their livelihood. As such, demand is futile as to Defendants J. Zhang, Jin, Yang, and Yu.

101. Defendant He has served as a Company director since 2019. Defendant He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant He receives significant compensation from the Company. As a Company director, Defendant He conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant He solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in, *inter alia,* the re-election of himself and other Director-Defendants, allowing them to continue to breach their fiduciary duties to the

Company. Moreover, Defendant He personally benefitted from the misconduct, selling 10,000 shares of Power Solutions common stock for gross proceeds of approximately $915,840 during the Relevant Period. For these reasons, Defendant He breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

102. Defendant Jin has served as a Company director since October 2025. Defendant Jin also serves as a member of the Strategic Committee. Defendant Jin receives significant compensation from the Company. According to the 2026 Proxy Statement, Defendant Jin is not independent under the applicable Nasdaq listing standards. As a Company director, Defendant Jin conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Jin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

103. Defendant Shea has served as a Company director since July 2025. In addition, she serves as a member of the Audit Committee. Defendant Shea receives significant compensation from the Company. As a Company director, Defendant Shea conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Shea breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

104. Defendant Simpkins has served as a Company director since July 2017. Defendant Simpkins also serves as Chair of the Audit Committee, and as a member of the Strategic Committee and Nominating and Governance Committee. Defendant Simpkins receives significant compensation from the Company. As a Company director, Defendant Simpkins conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Simpkins solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in, inter alia, the re-election of himself and other Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. Moreover, Defendant Simpkins personally benefitted from the misconduct, selling 15,000 shares of Power Solutions common stock for gross proceeds of approximately $1.39 million during the Relevant Period. For these reasons, Defendant Simpkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

105. Defendant Yang has served as a Company director since October 2025. Defendant Yang also serves as a member of the Nominating and Governance Committee and the Compensation Committee. Defendant Yang receives significant compensation from the Company. According to the 2026 Proxy Statement, Defendant Yang is not independent under the applicable Nasdaq listing standards. As a Company director, Defendant Yang conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Yang breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent or disinterested, and thus demand upon him is futile and, therefore, excused.

106. Defendant Yu has served as a Company director since July 2023. Defendant Yu is a member of the Compensation Committee. Defendant Yu receives significant compensation from the Company. According to the 2026 Proxy Statement, Defendant Yu is not independent under the applicable Nasdaq listing standards. As a Company director, Defendant Yu conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Yu solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in, inter alia, the re-election of himself and other Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant Yu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

107. Defendant J. Zhang has served as Chairman of the Board since 2023. In addition, Defendant J. Zhang serves as the Chair of the Strategic Committee. Defendant J. Zhang receives significant compensation from the Company. According to the 2026 Proxy Statement, Defendant J. Zhang is not independent under the applicable Nasdaq listing standards. Defendant J. Zhang receives significant compensation from the Company. As a Company director, Defendant J. Zhang conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant J. Zhang solicited the 2025 Proxy Statement, which contained material misrepresentations and omissions and resulted in, inter alia, the re-election of himself and other

Director-Defendants, allowing them to continue to breach their fiduciary duties to the Company. For these reasons, Defendant J. Zhang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

108. Further, Defendants Simpkins (as Chair), He, and Shea served as members of the Audit Committee during the Relevant Period (the "Audit Committee Defendants"). The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to make false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclose controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

109. Further, demand is excused based on the circumstances surrounding Landini's departure from the Board. On July 23, 2025, Landini, an incumbent director and member of the Audit Committee, resigned from the Board and Audit Committee. In his resignation letter, Landini stated that he was not nominated for re-election because of his "insistence on complying with the board's fiduciary duties, including that of loyalty, by notifying the board in writing of its obligations to, among others,…protect [Power Solutions'] supply chain by overseeing management's assessment of risk" and that the decision was of an "apparent, retaliatory nature."

At the time of Landini's resignation, the Board consisted of Director Defendants J. Zhang, He, Simpkins, and Yu along with Defendants Jiang, G. Zhang, and Yu. Given that a majority of the Director Defendants removed Landini from serving as a director after his expressed concerns with the Board breaching their fiduciary duties and lack of oversight, a demand on the Board would be futile as the Director Defendants would not impartially consider a demand asking the Company to investigate, let alone commence litigation against the Individual Defendants.

110. Power Solutions has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

111. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite the relevant codes, policies, and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

112. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed

to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

113. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

114. Publicly traded companies like Power Solutions typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

115. For the foregoing reasons, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## CLAIMS FOR RELIEF

## CLAIM I

***Against the Individual Defendants J. Zhang, Jiang, Simpkins, He, G. Zhang,***

***and Yu for Violations of Section 14(a) of the Exchange Act and Rule 14a-9***

116. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117. Individual Defendants J. Zang, Jiang, Simpkins, He, G. Zhang, and Yu solicited the 2025 Proxy Statement containing materially false and misleading statements and/or omissions.

118. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

119. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

120. The 2025 Proxy Statement failed to disclose that: (1) Power Solutions overstated its ability to capture sales demand for its power systems solutions, particularly within the data center market; (2) Power Solutions understated the impact of its enhancements to manufacturing capacity to meet demand within the data center market, including the expected costs and the nature of the related "inefficiencies"; and (3) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

121. Further the 2025 Proxy Statement failed to disclose that the Individual Defendants violated the Code of Ethics and that the Board and its committees were not adequately exercising risk oversight functions and were causing or permitting the Company to issue false and misleading statements.

122. In exercise of reasonable care, Individual Defendants J. Zhang, Jiang, Simpkins, He, G. Zhang, and Yu should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff and other shareholders in voting on matters set forth for shareholder determination including, but not limited to, the election of directors. As a result of the false and misleading statements, Defendants J. Zhang, Jiang, Simpkins, He, G. Zhang, and Yu, along with Defendant Shea, were elected to the Board.

123. The Company was damaged as a result of Individual Defendants J. Zhang, Jiang, Simpkins, He, G. Zhang, and Yu's material misrepresentations and omissions in the 2025 Proxy Statement.

124. Plaintiff, on behalf of Power Solutions, has no adequate remedy at law.

## **CLAIM II**

***Against the Individual Defendants for Breach of Fiduciary Duties***

125. Plaintiff incorporates by reference and re-alleges each and every allegation contained above as if fully set forth herein.

126. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

127. The Individual Defendants violated and breached their fiduciary duties of care,

loyalty, reasonable inquiry, and good faith.

128. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by engaging in the misconduct described herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

129. As a direct and proximate results of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

130. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, the costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

131. Plaintiff, on behalf of Power Solutions, has no adequate remedy at law.

**COUNT III**

***Against the Individual Defendants for Unjust Enrichment***

132. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Power Solutions.

134. The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received

bonuses, stock options, or similar compensation from Power Solutions that was tied to the performance or artificially-inflated valuation of Power Solutions or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

135. Plaintiff, as a shareholder and a representative of Power Solutions, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

136. Plaintiff, on behalf of Power Solutions, has no adequate remedy at law.

**COUNT IV**

***Against the Individual Defendants for Waste of Corporate Assets***

137. Plaintiff incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

138. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

139. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, inter alia: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (2) awarding self-interested stock options to certain officers and directors; and (3) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

140. As a result of the waste of corporate assets, the Individual Defendants are liable to

the Company.

141. Plaintiff, on behalf of Power Solutions, has no adequate remedy at law.

## COUNT V

***Against the Insider Selling Defendants for Insider Selling and Misappropriation of Information***

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

143. At the time of their stock sales set forth herein, the Insider Selling Defendants knew of material, non-public information concerning the Company and sold Power Solutions common stock on the basis of such information, using such information for their own benefit when they sold Power Solutions common stock.

144. The Insider Selling Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

145. Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

(b) Awarding against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and transactions complained of herein, together with pre-judgment interest, in a fashion that ensures

the Individual Defendants do not participate therein or benefit thereby;

(c) Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

(d) Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

(e) Awarding punitive damages;

(f) Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: August 20, 2026

Respectfully submitted,

/s/ Carl V. Malmstrom
Carl V. Malmstrom
Matthew Guiney
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLC**
111 W. Jackson Blvd., Suite 1700
Chicago, IL 60604
Tel: (312) 984-0000
Fax: (312) 686-0114
Email: malmstrom@whafh.com
Email: guiney@whafh.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim

275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*